**Slip Op. 04-13**

UNITED STATES COURT OF INTERNATIONAL TRADE

―――――――――――――――――――――――― :

BETHLEHEM STEEL CORPORATION, U.S. STEEL
GROUP, A UNIT OF USX CORPORATION, ISPAT     :
INLAND INC., LTV STEEL COMPANY, INC. and
NATIONAL STEEL CORPORATION,                 :

                     *Plaintiffs,*            :

           v.                     :

UNITED STATES,                              :   Court No. 99-08-00525

                     *Defendant,*             :

           and                    :

USINAS SIDERÚRGICAS DE MINAS GERAIS S/A,     :
COMPANHIA SIDERÚRGICA PAULISTA and
COMPANHIA SIDERÚRGICA NACIONAL,             :

               *Defendant-Intervenors.*   :

―――――――――――――――――――――――――

[U.S. Department of Commerce's Amended Final Remand Determination reaffirming countervailing duty suspension agreement remanded again for further action consistent with opinion.]

                           Decided:  February 17, 2004

     Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, and Jeffrey D. Gerrish) and Dewey Ballantine LLP (Alan Wm. Wolff and Michael H. Stein), for Plaintiffs.

     Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Lucius B. Lau); Linda S. Chang, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

   Willkie Farr & Gallagher (Christopher A. Dunn, Matthew R. Nicely, and Robert E. DeFrancesco), for Defendant-Intervenors.


## OPINION

RIDGWAY, Judge:

   In the immortal words of Yogi Berra, "It's deja vu all over again."[1]

   Bethlehem II – the first opinion in this action – remanded to the U.S. Department of Commerce ("Commerce") the July 1999 agreement between that agency and the Government of Brazil,[2] which suspended at the eleventh hour the investigation into alleged countervailable subsidies received from the Brazilian Government by three Brazilian steel exporters ("Brazilian Exporters").[3] See Bethlehem Steel Corp. v. United States, 25 CIT ____, 159 F. Supp. 2d 730 (2001) ("Bethlehem II").[4] Familiarity with that opinion is presumed.

---

  [1]John Bartlett, Familiar Quotations 754 (Justin Kaplan ed., 16th ed. 1992).

  [2]See Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel from Brazil, 64 Fed. Reg. 38,797 (July 19, 1999) (suspension of countervailing duty investigation and entry of suspension agreement) (Public Administrative Record Document ("P.R. Doc.") No.173) (the "Suspension Agreement" or the "Agreement").

  [3]The Brazilian Exporters – Usinas Siderúrgicas de Minas Gerais ("USIMINAS"), Companhia Siderúrgica Paulista ("COSIPA"), and Companhia Siderúrgica Nacional ("CSN") – are Defendant-Intervenors in this action.

  [4]Bethlehem I issued in a companion case challenging the suspension agreement in the parallel antidumping duty proceeding. Bethlehem Steel Corp. v. United States, 25 CIT ____, 146 F. Supp. 2d 927 (2001) ("Bethlehem I"). After Bethlehem I remanded that action to Commerce, the Brazilian steel exporters were determined to be in violation of that suspension agreement. The agreement was therefore terminated, and the action was dismissed. See Final Results of Antidumping Duty Administrative Review and Termination of the Suspension Agreement, Certain Hot-Rolled Flat-Rolled Carbon Quality Steel Products From Brazil, 67 Fed. Reg. 6226 (Feb. 11, 2002). Read together, Bethlehem I and Bethlehem II provide the backdrop for this opinion.

Bethlehem II found that the Suspension Agreement itself rebutted any presumption that the agency had considered the comments of the plaintiff domestic steel producers ("Domestic Producers"),[5] as required agency by the applicable statute. Specifically, the Agreement not only failed to incorporate any of the substantive revisions sought in the Domestic Producers' comments on the proposed agreement; it also failed to correct the numerous drafting errors and inaccuracies that their comments identified. Based on "Commerce's failure to comply with the notice, comment and consultation requirements of the suspension agreement statute," the remand was intended to permit the agency to "reconsider its Suspension Determination, giving due consideration to *all* of the petitioners' comments – the substantive ones as well as those identifying drafting or clerical errors." 25 CIT at ____, 159 F. Supp. 2d at 743.

Now before the Court is Commerce's Amended Final Redetermination Pursuant to Court Remand ("Amended Final Remand Results" or "Amended Remand Determination"). Commerce has there steadfastly reaffirmed its defense of the Suspension Agreement and, indeed, asserts boldly that "the only changes made . . . should be the corrections of the [specified] clerical errors." *Id*. at 8. *See also id*. at 38.

The Brazilian Exporters join Defendant, the United States ("the Government") in urging dismissal of this action, arguing that the Amended Final Remand Results are supported by substantial evidence and otherwise in accordance with law. *See* Defendant's Response in Opposition

_____

[5]The Domestic Producers are Bethlehem Steel Corporation; U.S. Steel Group, a unit of USX Corporation; Ispat Inland Inc.; LTV Steel Company, Inc.; and National Steel Corporation. As discussed in greater detail below, they constitute roughly half of the industry overall, and well over half of the industry that participated in the underlying investigation. *See* Bethlehem II, 25 CIT at ____ n.3, 159 F. Supp. 2d at 731 n.3.

to Plaintiffs' Comments on the Department of Commerce's Amended Final Remand Results ("Def.'s Brief") at 1-2; Defendant-Intervenors' Comments on the Department of Commerce's Amended Final Remand Determination ("Def.-Ints.' Brief") at 1.

In contrast, the Domestic Producers contend that "[d]espite being given not one, but two opportunities on remand, [Commerce] still has failed to meet *any* of the stringent requirements set forth in the [suspension agreement] statute . . . ." Plaintiffs' Comments on the Department of Commerce's Amended Final Remand Results ("Pls.' Brief") at 1-2. As such, the Domestic Producers assert that Commerce's Amended Final Remand Results, as well as its underlying suspension determination, are not supported by substantial evidence on the record and are otherwise not in accordance with law.

For the reasons set forth below, this action must be remanded yet again to the Department of Commerce.

## I. Background

In late September 1998, the Domestic Producers, among others, petitioned Commerce and the International Trade Commission ("ITC"), seeking the imposition of countervailing duties on certain steel products from Brazil. In keeping with the tight statutory deadlines established by the countervailing duty laws, the ITC issued its preliminary material injury determination one month later. Commerce's preliminary determination issued in mid-February 1999, finding that countervailable subsidies were indeed being provided to the Brazilian Exporters.

On June 6, 1999, barely one month prior to the deadline for its final determination, Commerce and the Brazilian Government initialed a proposed agreement to suspend the

countervailing duty investigation. Because the relevant statute requires that a suspension agreement be completed no later than the date of Commerce's final determination, and because the statute requires Commerce to notify and consult with petitioners at least 30 days in advance, June 6, 1999, was *the last possible day* on which Commerce could announce its intention to suspend the investigation. Commerce provided a copy of the proposed agreement to the Domestic Producers, and required that any comments be submitted by June 28, 1999.

The Domestic Producers filed a timely, and lengthy submission detailing numerous substantive objections to the proposed suspension agreement. Nevertheless, a few days later, on July 6, 1999 – the deadline for issuance of Commerce's final determination in the countervailing duty investigation – the agency and the Brazilian Government executed the Suspension Agreement. Commerce's final affirmative determination in the underlying investigation – issued that same day – found net subsidy rates for the Brazilian Exporters ranging between 6.35% and 9.67%.[6] However, as a result of the Suspension Agreement, no countervailing duty order has ever issued.

This challenge to the Suspension Agreement ensued, resulting in Bethlehem II and a remand to Commerce, "to enable [the agency] to comply with the notice, comment and consultation requirements of the suspension agreement statute; to allow it to articulate its interpretation of the monitoring provisions of the statute; to afford it the opportunity to articulate its interpretation of

---

[6]The following month, the I TC issued its final determination on material injury, confirming its affirmative preliminary finding.

certain provisions of the 'extraordinary circumstances' requirement of the statute . . .; to allow it to articulate its interpretation of the public interest requirement; and to permit it to reconsider the Suspension Agreement and its underlying Suspension Determination in that light." *See* Bethlehem II, 159 F. Supp. 2d at 762.

In lieu of filing the remand results in accordance with the timetable established in the order accompanying Bethlehem II, Commerce sought and was granted an extension of time of more than 60 days to, *inter alia*, "solicit and consider comments from the interested parties." *See* Defendant's Consent Motion for Extension of Time in which Commerce may File its Remand Results (Sept. 10, 2001) at 2. Commerce nevertheless did not release its draft remand results to the Domestic Producers until 6:00 p.m. on November 13, 2001 – under cover of a letter requiring that any comments be filed no later than close of business two days thereafter, and emphasizing that "no extensions can be granted." *See* Letter from Commerce to Skadden, Arps (Nov. 13, 2001), P.R. Doc. No. 265. Thus, more than 100 days elapsed before Commerce released its draft remand results. Moreover, during that period, the agency consulted with other entities, but engaged in no consultations with the Domestic Producers.[7] Yet, once it released its draft remand results, Commerce accorded the Domestic Producers less than 48 hours to analyze the draft results, research and draft comments, and file those comments.

When the Domestic Producers objected strenuously to Commerce's procedure, the agency filed its "final remand results" with the Court but sought, and was granted, a second remand to solicit

---

[7]*See*, *e.g.*, Commerce Memorandum to File Regarding Consultations with Consuming Industries, Producers, and Workers (Nov. 2, 2001), P.R. Doc. No. 261 (documenting Commerce consultations with other entities).

comments and to consult with the parties. *See* Order (Dec. 10, 2001) (granting Defendant's Consent Motion for Remand). Even after that second remand, however, Commerce did not initiate consultations with the Domestic Producers.

The Domestic Producers submitted comments on Commerce's final remand results on January 11, 2002. *See* Plaintiffs' Comments on the Department of Commerce's Amended Final Remand Results, P.R. Doc. No. 279 at 5. Still, Commerce did not meet with the Domestic Producers until February 19, 2002 – more than a month after the Domestic Producers had filed their comments on the "final remand results," three months after those "final remand results" were filed with the Court, more than three months after Commerce's draft remand results were released, more than six months after Bethlehem II remanded the case to the agency, and more than two and a half years after Commerce signed the Suspension Agreement.

In any event, as discussed below, the Domestic Producers contend that Commerce's February 2002 consultations were perfunctory and *pro forma*, at best. The Final Amended Remand Results here at issue were filed approximately two weeks thereafter.

## II. Analysis

As Bethlehem II explained, there are essentially two distinct types of suspension agreements in countervailing duty cases – so-called "subsection (b) agreements" and "subsection (c) agreements." *See generally* Bethlehem II, 25 CIT at ____, 159 F. Supp. 2d at 734-35. Subsection (b) agreements eliminate or offset completely a countervailable subsidy, or cease exports of the

subject merchandise. 19 U.S.C. § 1671c(b). In contrast, subsection (c) agreements – like the Suspension Agreement at issue here – do not cease exports; nor do they completely eliminate or offset countervailable subsidies. Rather, they eliminate only the exports' injurious effect. 19 U.S.C. § 1671c(c).

Prior to accepting either a subsection (b) or (c) agreement, Commerce must find both that "suspension of the investigation is in the public interest," and that "effective monitoring of the agreement by the United States is practicable." 19 U.S.C. § 1671c(d). Commerce also is required to notify petitioners of, and consult with them concerning, its intention to suspend the investigation. In addition, Commerce must provide petitioners with a copy of the proposed agreement, and accord them an opportunity to comment. 19 U.S.C. § 1671c(e).

But there are additional requirements for subsection (c) agreements. Because such agreements, by definition, allow some subsidy practices to continue, Congress restricted subsection (c) agreements to cases involving "extraordinary circumstances" – cases where the suspension of the investigation is more beneficial to the domestic industry than its continuation, and where the investigation is "complex." *See* S. Rep. No. 96-249 at 51 (discussing the extraordinary circumstances requirement set out in 19 U.S.C. § 1671c(c)(4)).

Moreover, while all subsection (c) agreements require findings of "extraordinary circumstances" and "complexity" (as discussed above), there are unique requirements for those subsection (c) agreements which are – like the Agreement at issue here – quantitative restriction

agreements.[8] Specifically, the statute mandates that, in evaluating the public interest vis-à-vis such an agreement, Commerce must both (i) consult with potentially affected consuming industries, as well as potentially affected producers and workers in the domestic industry, and (ii) take into account the impact of such an agreement on U.S. consumers, the international economic interests of the United States, and the competitiveness of the domestic industry (in addition to any other necessary or appropriate factors). 19 U.S.C. § 1671c(d)(1).

As Congress intended, Commerce has invoked the suspension provisions of the trade laws only infrequently in both countervailing duty and antidumping investigations. Notably, prior to the suspensions of both the countervailing duty investigation at issue and the parallel antidumping investigation, Commerce had accepted only four other subsection (c) agreements, including both antidumping and countervailing duty cases. Significantly, in each of those four prior cases, Commerce sought – and obtained – the consent of the petitioners. *See* Bethlehem II, 25 CIT at ____, 159 F. Supp. 2d at 735.

Attacking the Amended Final Remand Results, the Domestic Producers continue to challenge virtually every aspect of the suspension here at issue, arguing (a) that Commerce still has not complied with the notice, comment and consultation requirements of the suspension agreement

---

[8]A quantitative restriction agreement is an agreement by a foreign government to limit the volume of imports of the merchandise at issue into the United States – that is, an agreement establishing a quota. *See* 19 U.S.C. § 1671c(c)(3).

statute; (b) that there are no "extraordinary circumstances" in this case (*i.e.*, that, *inter alia*, the Agreement is not more beneficial to the domestic industry than a countervailing duty order); (c) that effective monitoring of the Agreement is not practicable; and (d) that the Agreement does not serve the public interest.

### A. Notice, Comment and Consultation

The notice, comment and consultation requirements of the suspension agreement statute mandate that, before entering into a suspension agreement, Commerce must:

> (1) notify the petitioner of, and consult with the petitioner concerning, its intention to suspend the investigation . . . not less than 30 days before the date on which it suspends the investigation,
>
> (2) provide a copy of the proposed agreement to the petitioner . . . together with an explanation of how the agreement will be carried out and enforced (including any action required of foreign governments), and of how the agreement will meet the requirements of subsections (b) and (d) or (c) and (d) of [the statute], and
>
> (3) permit all interested parties . . . to submit comments and information for the record before the date on which notice of suspension of the investigation is published . . . .

19 U.S.C. § 1671c(e).[9]  The legislative history of the statute highlights the importance of those provisions, emphasizing that "the requirement that the petitioner be consulted will not be met by pro forma communications.  Complete disclosure and discussion is required." S. Rep. No. 96-249 at 54.

---

[9]In addition to the consultation requirements of 19 U.S.C. § 1671c(e), which govern all suspension agreements under both subsections (b) and (c), there are additional consultation requirements which apply to quantitative restriction agreements such as the Suspension Agreement at issue here. *See* 19 U.S.C. § 1671c(d)(1).

From the beginning of this case, the Government has maintained that Commerce has complied fully with all applicable notice, comment and consultation requirements. However, as Bethlehem II noted, apart from several conclusory statements, the administrative record initially was utterly devoid of affirmative evidence "to indicate that Commerce even reviewed – much less considered or responded to – the petitioners' written comments" on the proposed suspension agreement. 25 CIT at ____, 159 F. Supp. 2d at 740. Similarly, Bethlehem II observed that, although the Government's brief stated that Commerce "met several times" with petitioners "'regarding its intention to suspend the investigation' . . . the only record evidence cited to support that assertion [was] the Suspension Determination, which state[d] simply that the petitioners were 'consulted.'" 25 CIT at ____ n.21, 159 F. Supp. 2d at 740 n.21 (citations omitted). And, according to the Domestic Producers, while "the Department did inform the Petitioners several times that it was determined to suspend the investigation regardless of whether Petitioners objected," Commerce "never consulted with the Petitioners regarding the details of the Agreement, as opposed to the concept of suspending the investigation." *Id.* (citations omitted). Indeed, at oral argument, counsel for the Government candidly conceded that the press of time had prevented Commerce from responding to the petitioners' comments in its Suspension Determination or engaging in greater consultation. Bethlehem II, 25 CIT at ___ n.24, 159 F. Supp. 2d at 742 n.24 (citation omitted).[10]

_____

[10]As summarized in section I above and detailed in Bethlehem II, Commerce notified petitioners here of the proposed suspension agreement on the *last possible day* under the suspension agreement statute, given the imminent deadline for issuance of the agency's final countervailing duty determination. 25 CIT at ____, 159 F. Supp. 2d at 735-36. Commerce's timing thus truly came "down to the wire," placing tremendous pressure on the agency and all parties. As Bethlehem II noted, there can be no doubt that "the tandem tasks of both finalizing the [agency's] Final Determination and determining whether to suspend the investigation in fact did tax Commerce

As discussed above, Bethlehem II concluded that the Suspension Agreement itself rebutted any presumption that the agency had considered all evidence of record in reaching its determination. Specifically, Bethlehem II reasoned that "Commerce's failure . . . to correct in the final Suspension Agreement even the drafting and clerical errors identified by the petitioners [was] compelling evidence that Commerce failed to give appropriate consideration to the petitioners' written comments." 25 CIT at _____, 159 F. Supp. 2d at 743. Based on "Commerce's failure to comply with the notice, comment and consultation requirements of the suspension agreement statute," the case was remanded to the agency, to permit it to "reconsider its Suspension Determination, giving due consideration to *all* of the petitioners' comments – the substantive ones as well as those identifying drafting or clerical errors" and to permit it to "undertake any further consultation that may be appropriate." *Id*.

The Amended Final Remand Results acknowledge that the Agreement includes "minor clerical errors," and indicate that Commerce has reached an agreement with the Brazilian Government to correct those errors. Amended Final Remand Results at 35. But the Domestic Producers charge that Commerce nevertheless remains in default on its notice, comment and consultation obligations under the statute. *See generally* Pls.' Brief at 2-12.

---

personnel to the limit." In fact, Commerce had revised its regulations in 1997 to significantly advance the deadlines for initialing and signing suspension agreements to avoid precisely the dilemma presented here – the "enormous burden on the parties and on the Department" inherent in the simultaneous consideration of a suspension agreement and preparation of a final determination. It is unclear why that regulatory timeline was ignored in this case. 25 CIT at _____ n.24, 159 F. Supp. 2d at 742 n.24.

The Domestic Producers assert that, in contravention of the directive in Bethlehem II, Commerce failed on remand to fundamentally reconsider the Suspension Agreement and the underlying suspension determination. Pls.' Brief at 8-12. The purpose of the remand was, in fact, to permit Commerce to "*reconsider* its Suspension Determination." Bethlehem II, 25 CIT at ____, 159 F. Supp. 2d at 743 (emphasis added). Moreover, as the Domestic Producers emphasize, Bethlehem II expressly disavowed any assumptions as to "the outcome on remand," opining that "[w]hile it is possible that, upon reconsideration, Commerce will once again conclude that suspension is justified and that the Suspension Agreement should remain unchanged, it is also conceivable that Commerce will determine that – while suspension is justified – some of the terms of the Agreement must be altered, or that Commerce will abandon the concept of a suspension agreement entirely." Pls.' Brief at 8-9 (*quoting* Bethlehem II, 25 CIT at ____ n.8, 159 F. Supp. 2d at 732 n.8).

As evidence that Commerce failed to comply with the mandate to reconsider the Suspension Agreement, the Domestic Producers point first to the failure of the Amended Final Remand Results to address a number of their comments, which they submitted initially in late June 1999 (on the then proposed Suspension Agreement), and later resubmitted (in response to Commerce's initial remand results). According to the Domestic Producers, Commerce "ignored" their suggestions in its Final Amended Remand Results, even though their comments on the initial remand results specifically noted that the agency had not previously addressed certain specific points. Pls.' Brief at 9-10.

However, Commerce is not required to *respond* to all comments; rather, its obligation is to *give meaningful consideration* to them. The Domestic Producers have cited no authority to support

their intimation to the contrary. *See generally* <u>Bethlehem II</u>, 25 CIT at _____ n.23, 159 F. Supp. 2d at 740 n.23 (discussing Commerce's past practice on responding to comments on draft suspension agreements, in context of Domestic Producers' criticism of Commerce's failure to respond to comments). Moreover, absent some showing to the contrary, Commerce is presumed to have considered not only all comments, but all evidence of record, in reaching its determinations. 25 CIT at _____, 159 F. Supp. 2d at 741 (*citing*, *inter alia*, <u>Hoogovens Staal BV v. United States</u>, 24 CIT 242, 247, 93 F. Supp. 2d 1303, 1307 (2000) ). Indeed, in this case, the Amended Final Remand Results affirmatively state that Commerce "did, in fact, consider all of plaintiffs' other comments, and determined that none of these other proposed substantive changes were required." Amended Final Remand Results at 40.[11]

Similarly unpersuasive is the Domestic Producers' complaint that, of their comments that Commerce specifically addressed, the agency "flatly rejected every single one." Pls.' Brief at 10-11. The fact that Commerce does not agree with and adopt a party's comments does not *ipso facto* prove that the agency failed to give them meaningful consideration.

The Domestic Producers' claim that Commerce failed to "give any meaningful consideration to terminating or abandoning the Agreement" is nevertheless a matter of grave concern. *See* Pls.' Brief at 11-12. The Amended Final Remand Results state simply that "Commerce has not only considered the possibility of termination, but has also discussed this possibility with the

---

[11]In its brief, the Government provides summary responses to the substance of each of the comments that the Domestic Producers assert were ignored. *Compare* Def.'s Brief at 51-53 *with* Pls.' Brief at 9-10. However, those responses are not based on the record and, as such, constitute *post hoc* rationalization by litigation counsel.

[Government of Brazil]" and "[c]ontrary to the assertion of plaintiffs, Commerce did in fact consider the various options posed by the Court, including whether or not to alter or to abandon the Agreement." Amended Final Remand Results at 8, 38. The administrative record is devoid of any real explanation, reasoning or analysis by the agency. And, indeed, the Amended Final Remand Results and the record on remand themselves suggest that Commerce considered termination only to the extent that it raised the matter with the Government of Brazil – and, even then, in the context of the termination of the companion antidumping suspension agreement. Amended Final Remand Results at 6-7 (discussing Commerce's consultations with the Brazilian Government as to whether it wished to terminate the Agreement); P.R. Doc. Nos. 281, 285, 286.[12] Here, Commerce has failed to compile a record sufficient to enable a court to "satisfy itself that the agency exercised a reasoned discretion" in determining not to terminate – or revise – the Suspension Agreement. *See* Greater Boston Television Corp. v. Federal Communications Comm., 444 F.2d 841, 850 (D.C. Cir. 1971).

The Domestic Producers further contend that Commerce failed to engage in "meaningful consultations" with them, as required by the suspension agreement statute. *See* Pls.' Brief at 6-8. The Government retorts that it "sought remand expressly to allow Bethlehem a full opportunity to provide its comments." Def.'s Brief at 50. As Bethlehem II explained, however, the consultation requirements imposed by the statute are separate and distinct from its notice and comment

---

[12]*See* Appendices 11-13 to Defendant's Appendix for Defendant's Response in Opposition to Plaintiffs' Comments on the Department of Commerce's Amended Final Remand Results.

requirements. 25 CIT at _____ n.26, 159 F. Supp. 2d at 743 n.26. Thus, Commerce's solicitation and consideration of written comments from the Domestic Producers could not fulfill the agency's independent obligation to consult with them.

Commerce's reliance on its face-to-face meeting with the Domestic Producers' counsel is similarly problematic. *See* Def.'s Brief at 50. As discussed above, the legislative history of the suspension agreement statute makes it clear that "the requirement that the petitioner be consulted will not be met by pro forma communications." S. Rep. No. 96-249 at 54. Congress imposed the consultation requirement on Commerce to ensure that petitioners have a meaningful opportunity to present their views. But, as reflected in the Commerce Department's own memo summarizing its meeting with the Domestic Producers, "the Department briefed Petitioners on the Department's . . . consultations with the Brazilians and their request to maintain the CVD suspension agreement. [Petitioners' counsel] stated that Petitioners are opposed to maintaining the CVD suspension agreement." Commerce Memorandum on Consultations with Plaintiffs, P.R. Doc. No. 280. Commerce's own words paint a picture of "consultations" that can only be described as perfunctory and *pro forma*, in patent contravention of the statute – an impression that is further reinforced by the timing of the meeting, which Commerce held a full three months *after* it had filed its final remand results (defending the Agreement to the very letter).

In light of Commerce's failure to consult meaningfully with the Domestic Producers before signing the Suspension Agreement, the agency's belated "consultation" on remand simply adds insult

to injury. The agency's record of "consultation" – both initially, and on remand – also tends to belie a sincere interest in seeking to ascertain and (if possible) accommodate legitimate concerns of petitioners, and to suggest instead a desire to "go through the motions" of conferring and then to "paper over" any objections.

Commerce's failure in this case to consult meaningfully with the petitioners and its failure to give meaningful consideration to terminating or abandoning the Agreement are, in fact, both mere symptoms of a much greater, underlying problem – the unique circumstances surrounding the execution of this Agreement. Due to its own failure to allow itself sufficient time to consult meaningfully with the Domestic Producers before entering into the Suspension Agreement, Commerce may well now feel trapped between a rock and a hard place. Although it has sought (however belatedly) to consult with the Domestic Producers, it (at least arguably) cannot repudiate the Agreement, or even revise it without the consent of the Brazilian Government. Under these circumstances, it is perhaps not surprising that Commerce's general tenor throughout these proceedings has been to minimize or dismiss the Domestic Producers' comments and concerns.

One can only speculate what the Suspension Agreement would have looked like had Commerce allowed itself sufficient time to confer in advance with the Domestic Producers in order to ascertain their concerns, and then to negotiate with the Brazilian Government in an effort to resolve them. Maybe timely consultations and negotiations would have yielded a suspension agreement acceptable to the Domestic Producers (as such consultations and negotiations have in all

other cases);[13] maybe there would have been no agreement at all. In any event, it is highly unlikely

that – had Commerce consulted with the Domestic Producers in a timely fashion (as the statute

requires) – any resulting agreement would have been identical in every respect to the Agreement now

in place.

Further, due to the unique posture of this case, Commerce now necessarily views the

Domestic Producers' comments through the prism of an *executed* Agreement by which it is bound,

and rejects their concerns because (according to Commerce) they do not reflect either a violation of

the statute, or a violation of the Agreement (which would justify its termination). *See*, *e.g.*, Amended

Final Remand Results at 8. There can be little doubt that this is a very different – and much more

rigorous – standard for comments than that which Commerce has applied in other cases, where it has

consulted petitioners in advance. In this sense, Commerce's violation in this case of its *procedural*

obligation under the statute to consult with petitioners before concluding the Agreement has

potentially far-reaching and fundamental *substantive* implications for the case.

It is, of course, impossible to turn the clock back to a time before the Suspension Agreement

was signed. It is thus now impossible for Commerce to fulfill – literally – the statutory requirement

that the agency engage in meaningful consultations with petitioners "not less than 30 days" before

---

[13]As noted above, Commerce sought – and obtained – the consent of the petitioners to each of the four subsection (c) suspension agreements that predated the suspension agreements in this case and in the companion antidumping proceeding. None of those other cases involved the exigencies present in this case, and in the companion case; thus, there was presumably the opportunity for greater consultation and negotiation between Commerce and the domestic interests on the one hand, and between Commerce and the foreign interests on the other hand. Of course, as Bethlehem II explained, Commerce has no one but itself to blame for the exigency surrounding the Agreements both in this case and in the companion case. 25 CIT at _____ n.24, 159 F. Supp. 2d at 742 n.24.

the date of suspension. *See* 19 U.S.C. §1671c(e)(1). Given the fact of the executed Suspension Agreement, Commerce's willingness (and perhaps its ability) to give meaningful consideration to terminating or abandoning that Agreement is similarly constrained. In short, it is clear that the Domestic Producers have been deprived of certain procedural rights accorded them by the statute. What is entirely unclear is whether those deprivations can be effectively remedied.

This matter thus must be remanded to afford Commerce one final opportunity to engage in further consultations with the Domestic Producers (if appropriate), and – in any event – to make the case that its consultations have, indeed, been meaningful. At the same time, Commerce must give meaningful consideration to terminating, abandoning or revising the Agreement, in light of the Domestic Producers' comments and the agency's consultations; and that consideration must be sufficiently documented in the administrative record to enable a court to review the agency's action and satisfy itself that the agency's consideration of options was, indeed, meaningful.

Because the matter is being remanded to enable Commerce to demonstrate compliance with the notice, comment and consultation requirements of the suspension agreement statute, a "substantial evidence" review of the agency's factual findings would be premature. *See generally* Bethlehem II, 25 CIT at ____, 159 F. Supp. 2d at 743. Even as to legal issues, considerations of judicial economy and deference to agency autonomy and expertise counsel restraint – with the exception of one major, overarching legal issue, addressed below.

### B. Extraordinary Circumstances/"Beneficiality"

As summarized in section II above, subsection (c) agreements (like the Suspension Agreement here) are limited to cases involving "extraordinary circumstances" – that is,

circumstances in which, *inter alia*, "suspension of an investigation will be *more beneficial to the domestic industry* than continuation of the investigation." 19 U.S.C. §§ 1671c(c)(1), 1671c(c)(4)(A) (emphasis added). The parties here have spilt much ink on this so-called "beneficiality" requirement and, in particular, on the Domestic Producers' contention that it implicitly requires petitioners' consent for a subsection (c) agreement; or, stated differently, that the petitioning domestic industry wields "veto power" over suspension agreements of the type at issue here. *See generally* Bethlehem II, 25 CIT at ____, 159 F. Supp. 2d at 747-50; Pls.' Brief at 14-24; Def.'s Brief at 25-30; Def.-Ints.' Brief at 9-12.

As Bethlehem II pointed out, "On its face, the language of the suspension agreement statute "entrust[s] the 'more beneficial' determination to Commerce, and . . . [does] not expressly accord the domestic industry a veto power.'" 25 CIT at ____, 159 F. Supp. 2d at 748 (*quoting* Bethlehem I, 25 CIT at ____, 146 F. Supp. 2d at 947-48). However, Bethlehem II did not rule on the Domestic Producers' contention that the "beneficiality" requirement implicitly requires their consent; instead, it stated that, "[o]n remand, Commerce will have the opportunity at the administrative level to explain its interpretation of the 'more beneficial' requirement, in light of the legislative history and Commerce's own prior practice." Bethlehem II, 25 CIT at ____, 159 F. Supp. 2d at 753.

In its Amended Final Remand Results, Commerce roundly rejects the Domestic Producers' readings of both the legislative history of the suspension agreement statute and agency past practice. *See generally* Amended Final Remand Results at 47-51.

The Domestic Producers have continued to rely heavily on a statement by Senator Heinz that he "would find it very difficult to believe a judgment that the domestic industry would benefit more

from a suspension agreement than a completed investigation if that industry had expressed its opposition to such an action." Pls.' Brief at 15-16 (*quoting* 125 Cong. Rec. 20,168 (1979)). On remand, Commerce minimized the significance of that statement, concluding that – viewed in context – it was reflective of the Senator's personal opposition to suspension agreements in principle. *See* Def.'s Brief at 27-28 (*citing* Amended Final Remand Results at 47-48).

The Domestic Producers quarrel with Commerce's characterization of the Heinz statement as "personal," and argue that – as a sponsor of the bill – statements by the Senator are properly treated as authoritative legislative history pursuant to applicable rules of statutory construction. *See* Pls.' Brief at 16-19. However, as Commerce pointed out, Senator Heinz also commented that "the domestic industry would be expected to have *some input* into the question of whether it would benefit by an assurance." Amended Final Remand Results at 48 (*quoting* 125 Cong. Rec. 20,168 (emphasis added)). As the Amended Final Remand Results correctly note, "[t]he fact that even the strongest proponent of limitations on suspension agreements and 'assurances' did not find it generally obvious that the domestic industry would have more than 'some input' belies the suggestion that such input was generally assumed by the Congress to reach the level of a veto." Amended Final Remand Results at 48.

The Domestic Producers seek to buttress the authority of the Heinz statement on which they rely by noting that Commerce has given the statement great weight in the past. In particular, the Domestic Producers point to a 1992 memo (the "Powell Memo") prepared by Commerce's then-Chief Counsel for Import Administration, which advised – relying on the Heinz statement – that the "beneficiality" requirement presented a "serious obstacle" to concluding an elimination-of-injury

agreement such as the Suspension Agreement here, because "[t]he legislative history of this provision indicates that Congress arguably intended it to require that the domestic industry consent to this type of agreement." *See* Pls.' Brief at 19-21 (citation omitted). The Executive Summary of the Powell Memo was to the same effect, stating that "most options carry procedural requirements. These include: securing the agreement of the domestic petitioner . . . ." *See id.* at 20.

In its Amended Final Remand Results, Commerce embarks on linguistic analysis in an effort to establish that the sentence in the Powell Memo concerning the legislative history of the statute was nothing more than an attempt to identify hypothetical arguments that might be made by litigants challenging a subsection (c) agreement. *See* Amended Final Remand Results at 49. Commerce similarly seeks to explain away the statement quoted from the Powell Memo's Executive Summary. *Id.* at 49-50. But, as the Domestic Producers observe, Commerce's efforts are more than strained. *See* Pls.' Brief at 21-22.

The Domestic Producers may well be right that "the inescapable conclusion that must be drawn from the Powell Memorandum is that the Department itself has previously determined that it is required to secure the consent of petitioners for an elimination-of-injury suspension agreement like that entered into in this case." *See id.* at 22. But that is not necessarily the end of the matter. Commerce may change its views. *See* McClatchy Newspapers, Inc. v. N.L.R.B., 131 F.3d 1026 (D.C. Cir. 1997) (holding that agencies are entitled to deviate from reasoning used in prior decisions). Thus, "there is no rule of administrative stare decisis. Agency practice, once established, is not frozen in perpetuity. Agencies frequently adopt one interpretation of a statute and then, years later, adopt a different view. As long as the new interpretation is consistent with congressional

intent, an agency may make a 'course correction.'" Toyota Motor Sales, U.S.A., Inc. v. United States, 7 CIT 178, 192-93, 585 F. Supp. 649, 661 (1984) (citations omitted); *cf.*, Santa Fe Pac. R.R. Co. v. United States, 294 F.3d 1336 (Fed. Cir. 2002) (holding that an agency may change its position if it believes that the previous position was based on a mistaken legal interpretation).

As a general principle, of course, an agency is required to provide an adequate explanation for departing from prior practice. *See* Hussey Copper, Ltd. v. United States, 17 CIT 993, 834 F. Supp. 413, 418 (1993). Under the circumstances of this case, it is unclear whether Commerce's prior approach to suspension agreements – including the Powell Memo – amounts to a prior practice. *See generally* Bethlehem II, 25 CIT at ____ n.23, ____ n.37, 159 F. Supp. 2d at 740 n.23, 749 n.37 (reserving judgment as to existence of established agency practice concerning suspension agreements, and summarizing case law on requirements for departure from such practices). In any event, to the extent that it can be said that Commerce has an established practice of interpreting the legislative history discussed above to require petitioners' consent to a subsection (c) agreement, the agency's analysis of the suspension agreement statute and its legislative history in the Amended Final Remand Results adequately justifies its departure from such practice.

To say that the statute does not require petitioners' consent to a subsection (c) agreement, however, is not to say that their opposition is irrelevant. Even if petitioners' consent is not *per se* required, the extent of the domestic industry's consent – or opposition – logically must bear on (and, arguably, itself constitutes evidence as to) whether or not a suspension agreement is, in the words of the statute, "more beneficial to the domestic industry." When Commerce elects to enter into a subsection (c) agreement over the objections of a majority of the industry, it does so at its peril –

particularly where, as here, it cannot point to "early settlement" as a benefit.  Commerce is being far too cavalier here.  It cannot dismiss the fact that a majority of the industry affirmatively and vehemently opposes the Suspension Agreement, and no one – not a single domestic producer or consumer – affirmatively supports it.

Some aspects of a "more beneficial" judgment are inherently subjective, just as some are necessarily predictive.  It is therefore the height of hubris to presume to tell a majority of the industry what is in its best interests.  While it is true that the statute requires – as a precondition to a subsection (c) agreement – that Commerce make a determination as to whether the agreement is more beneficial to the domestic industry, it strains credulity to suggest that Congress intended that Commerce substitute its judgment for a majority of those in the trade, who live and breathe the industry every day, and whose futures and fortunes are inextricably tied to it.

Reviewing this administrative record as a whole, one is left with a distinctly uneasy sense that there is more here than meets the eye – that not all the cards are on the table.  On remand, Commerce will have the opportunity to directly address the extent of the opposition of the domestic industry, and to articulate precisely why its judgment as to the best interests of the industry should be credited over that of the industry itself.

### III.  **Conclusion**

For the reasons set forth above, this case is remanded yet again to the Department of Commerce, to afford it one final opportunity to comply with the notice, comment and consultation requirements of the suspension agreement statute, and to make the case that its consultations have been meaningful; to allow Commerce to give meaningful consideration to terminating, abandoning, or revising the Suspension Agreement, in light of the Domestic Producers' comments and the agency's consultations (and to document that consideration in the administrative record so that it can be subjected to judicial review); and to permit Commerce to directly address the extent of the opposition of the domestic industry, and to articulate precisely why – under the circumstances of this case – its judgment as to the best interests of the industry should be credited over that of the industry itself.

A separate order will enter accordingly.

    /s/   Delissa A. Ridgway    
Judge

Decided:  February 17, 2004
        New York, New York