**Slip Op. 05-4**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| _____ : | |
| UNITED STATES STEEL CORPORATION and ISPAT INLAND INC., : | |
| *Plaintiffs*, : | |
| v. : | |
| UNITED STATES, : | Court No. 99-08-00525 |
| *Defendant*, : | |
| and : | |
| USINAS SIDERÚRGICAS DE MINAS GERAIS S/A, COMPANHIA SIDERÚRGICA PAULISTA and COMPANHIA SIDERÚRGICA NACIONAL, : | |
| *Defendant-Intervenors*. : | |
| _____ | |

[Action challenging countervailing duty suspension agreement is dismissed, pursuant to Stipulation of Dismissal submitted by Plaintiffs and signed by all parties, following termination of suspension agreement and issuance of countervailing duty order.]

Decided:  January 21, 2005

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, and Jeffrey D. Gerrish), for Plaintiffs.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini and Ada E. Bosque); Christine J. Sohar and Peter J.S. Kaldes, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

Willkie Farr & Gallagher (William H. Barringer and Christopher A. Dunn), for Defendant-Intervenors.

**OPINION**

RIDGWAY, Judge:

More than six years ago, the plaintiff domestic steel producers ("Domestic Producers"),[1] among others, petitioned for the initiation of parallel antidumping and countervailing duty proceedings, alleging that various Brazilian producers ("Brazilian Exporters")[2] were both selling steel in this country at less than fair value, and receiving countervailable subsidies from the Government of Brazil. In July 1999, following intense investigations spanning more than eight months (and on the "drop dead" due date for the U.S. Department of Commerce's issuance of its Final Determinations in the two cases),[3] the agency suspended both proceedings pursuant to

---

[1]Together, the plaintiff Domestic Producers constitute roughly half of the industry overall, and well over half of the industry that participated in the underlying investigation. *See* Bethlehem Steel Corp. v. United States, 25 CIT 895, 896 n.3, 159 F. Supp. 2d 730, 731 n.3 (2001) ("Bethlehem II"); Bethlehem Steel Corp. v. United States, 28 CIT ____, ____ n.5, 316 F. Supp. 2d 1309, 1311 n.5 (2004) ("Bethlehem III").

When this action was filed, the plaintiffs included – in addition to U.S. Steel Group, a unit of USX Corporation, and Ispat Inland Inc. – Bethlehem Steel Corporation, LTV Steel Company, Inc., and National Steel Corporation. *See* Bethlehem II, 25 CIT at 896 n.3, 159 F. Supp. 2d at 731 n.3; Bethlehem III, 28 CIT at ____ n.5, 316 F. Supp. 2d at 1311 n.5. However, Bethlehem Steel has since declared bankruptcy, and has been dissolved; and LTV Steel and National Steel were determined to no longer have an interest in this litigation. Those three companies were therefore dismissed from the action, and the caption of the case was modified accordingly. *See* Consent Motion to Dismiss Certain Plaintiffs (June 1, 2004); Order (June 3, 2004).

[2]The three Brazilian Exporters that are Defendant-Intervenors in this action – Usinas Siderúrgicas de Minas Gerais, Companhia Siderúrgica Paulista, and Companhia Siderúrgica Nacional – were the respondents in the underlying countervailing duty investigation, and were respondents in the parallel antidumping investigation as well.

[3]*See* footnote 8, *infra*.

agreements which it entered into – at the eleventh hour – with the Brazilian producers (in the antidumping case) and the Government of Brazil (in the countervailing duty case). The Domestic Producers brought actions challenging both suspension agreements.[4]

This case has already spawned two opinions – Bethlehem II and Bethlehem III, both of which remanded to the Commerce Department that agency's determination to suspend its investigation into alleged countervailable subsidies received from the Brazilian Government by the three Brazilian steel exporters.[5] *See* Bethlehem II, 25 CIT at 896, 927, 159 F. Supp. 2d at 732, 762; Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1311-12, 1322. Familiarity with those opinions is presumed.

In response to Bethlehem III, Commerce filed its Final Redetermination Pursuant to Court Remand ("Redetermination on Remand"). The Government continued to staunchly defend the Suspension Agreement, asserting, *inter alia*, that "Commerce did everything possible to comply fully with the notice, comment, and consultation requirement[s] of the suspension agreement statute," but

---

[4]Bethlehem I issued in the companion case, which challenged the suspension agreement in the parallel antidumping duty proceeding. Bethlehem Steel Corp. v. United States, 25 CIT 519, 146 F. Supp. 2d 927 (2001) ("Bethlehem I"). After Bethlehem I remanded to Commerce the suspension agreement in that proceeding, the Brazilian steel exporters were found to be in violation of the agreement. Commerce therefore terminated the agreement, and the action was dismissed. *See* Certain Hot-Rolled Flat-Rolled Carbon Quality Steel Products From Brazil: Final Results of Antidumping Duty Administrative Review and Termination of the Suspension Agreement, 67 Fed. Reg. 6,226 (Dep't Commerce Feb. 11, 2002).

Read together, Bethlehem I, Bethlehem II, and Bethlehem III provide the backdrop for this opinion.

[5]*See* Suspension of Countervailing Duty Investigation: Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 64 Fed. Reg. 38,797 (Dep't Commerce July 19, 1999) (suspension of countervailing duty investigation and entry of suspension agreement) (the "Suspension Agreement" or the "Agreement").

concluded that "it was not appropriate to terminate the agreement . . . because the agreement provides concrete benefits and those benefits outweigh the benefits available under a CVD order." The Government therefore urged that the Court "sustain Commerce's Final Redetermination and dismiss this action." *See* Defendant's Response to Plaintiffs' Comments on the Final Redetermination Pursuant to Court Remand ("Defendant's Brief") at 5, 13, 30.[6]

In contrast, the Domestic Producers maintain that the Suspension Agreement fails to meet any of the "stringent and extensive requirements in the statute that must be satisfied before the Department of Commerce . . . may enter into a suspension agreement." Plaintiffs' Comments on the Final Redetermination Pursuant to Court Remand Issued By the Department of Commerce ("Plaintiffs' Brief") at 1. According to the Domestic Producers, Commerce's Redetermination on Remand evinces "a complete and brazen disregard for the Court's rulings," and "is an affront not only to Plaintiffs, but to the Court as well." *Id*. at 2. The Domestic Producers' comments therefore urged that "the Court . . . determine, once and for all" that "Commerce's determination to enter into and maintain the Suspension Agreement is not supported by substantial evidence on the record and is otherwise not in accordance with law," and that "[t]he Court . . . direct Commerce to terminate the Agreement and issue a countervailing duty order forthwith." *Id*. at 2-3, 55. *See also* Plaintiffs' Reply Brief on the Final Redetermination Pursuant to Court Remand ("Plaintiffs' Reply Brief") at 1 (reiterating that Commerce should be directed to terminate the Suspension Agreement and issue a countervailing duty order, in light of the agency's "repeated intransigence").

---

[6]The Brazilian Exporters elected not to participate in the briefing on Commerce's Redetermination on Remand.

Recent developments, however, have now obviated the need for a final ruling on the

lawfulness of the Suspension Agreement. The Government of Brazil has terminated the

Agreement, and a countervailing duty order has been issued by Commerce.[7] In light of those events,

_____

[7]*See* Agreement Suspending the Countervailing Duty Investigation on Hot-Rolled Flat-Rolled Carbon-Quality Steel From Brazil; Termination of Suspension Agreement and Notice of Countervailing Duty Order, 69 Fed. Reg. 56,040 (Dep't of Commerce Sept. 17, 2004).

Reports in the trade press indicate that "Brazil first notified the U.S. of its intention to pull out of the [Suspension Agreement] *during a June 24-25 meeting* with Deputy Assistant Secretary for Policy and Negotiations Joe Spetrini," and that Brazil formally gave notice in a July 28 letter to Commerce. *See* "Brazil Pulls Out of Hot-Rolled Steel CVD Suspension Agreement," Inside U.S. Trade, Aug. 6, 2004, at 10 (emphasis added). However, the Government failed to advise the Court of the Brazil's intentions until August 16, 2004 – *seven weeks* after Brazil's first notice to Commerce, and even *two weeks* after Brazil's formal notice. *See* [Defendant's] Consent Motion for Leave to File a Status Report and Status Report (dated August 12, 2004 and filed August 16, 2004). In the meantime, the Court had independently learned of Brazil's action through accounts in the news media. *See* Letter from Court to Counsel (Aug. 13, 2004) (enclosing copy of news article).

Moreover, although Commerce submitted an "updated administrative record" to the Court on August 6 (more than a week before the Government's Status Report was filed), Commerce's cover letter gave no indication as to the contents of that updated record (which, the Court later discovered, included at page 351 a copy of Brazil's July 28 letter). *See* Letter from U.S. Dep't of Commerce to Clerk of Court (Aug. 6, 2004) (transmitting "updated administrative record").

Counsel are obligated to ensure that the court is promptly apprised of relevant developments in any case. The precise definition of "promptness" in a particular situation depends on (a) the significance of the development, and (b) the procedural status of the case at the time.

Here, it is beyond cavil that the development in question had great significance; indeed, Brazil's action arguably mooted the case. Moreover, the case was fully submitted to the Court – Commerce had filed its Redetermination on Remand, and all briefing had been completed. Given that procedural status, Brazil's action – arguably mooting the case – took on even greater significance. Not only their obligations to the court, but also mere common courtesy required that counsel immediately notify the Court of Brazil's intentions, so that the Court could confer with the parties (if appropriate) and decide whether to continue to devote judicial resources to analysis of the remand results and the comments thereon.

Here, there is a very strong argument that the Government (and perhaps the Brazilian

the plaintiff Domestic Producers have filed with the Court a Stipulation of Dismissal, signed by all parties.

Accordingly, pursuant to that Stipulation, and with the observations that follow, this action is dismissed.

## I. Background

In late September 1998, the Domestic Producers, among others, petitioned Commerce and the International Trade Commission ("ITC"), seeking the imposition of countervailing duties on certain steel products from Brazil. The ITC issued an affirmative preliminary material injury determination one month later. Commerce's preliminary determination followed, in mid-February 1999, finding that countervailable subsidies were indeed being provided to the Brazilian Exporters.

On June 6, 1999, barely one month prior to the deadline for its final determination, Commerce and the Brazilian Government initialed a proposed agreement to suspend the countervailing duty investigation. Because the relevant statute requires that a suspension agreement be completed no later than the date of Commerce's final determination, and because the statute requires that the agency notify and consult with petitioners at least 30 days in advance, June 6 was *the last possible day* on which Commerce could announce its intention to suspend the investigation.[8]

---

Exporters as well) should have given appropriate notice to the Court immediately following Commerce's June 24-25 meeting with the Government of Brazil. Certainly there can be no excuse for delaying even a day after the July 28 letter.

[8]The deadline for Commerce's Final Determination had already been extended several times, and could not be extended past July 6, 1999 – the agency's "drop-dead" due date. *See generally* Bethlehem II, 25 CIT at 900 n.17, 159 F. Supp. 2d at 736 n.17 (citing the relevant provisions of the statute, and detailing their application to the facts of this case).

Commerce provided a copy of the proposed agreement to the Domestic Producers, and required that any comments be submitted by June 28, 1999.

The Domestic Producers filed a timely and lengthy submission, detailing numerous substantive objections to the proposed suspension agreement (and identifying a number of typographical errors and erroneous cross-references). Nevertheless, a few days later, on July 6, 1999 – the deadline for issuance of Commerce's final determination in the countervailing duty investigation – the agency and the Brazilian Government executed the Suspension Agreement. No changes were made in response to the Domestic Producers' comments. Even the typographical errors and erroneous cross-references went uncorrected.[9]

Commerce's final affirmative determination in the underlying investigation – issued that same day – found net subsidy rates for the Brazilian Exporters ranging between 6.35% and 9.67%.[10] However, as a result of the Suspension Agreement, no countervailing duty order was issued.

## II.  The Suspension Agreement Statute

As discussed in Bethlehem II, there are essentially two distinct types of suspension agreements in countervailing duty cases – so-called "subsection (b) agreements" and "subsection (c) agreements." *See generally* Bethlehem II, 25 CIT at 898-99, 159 F. Supp. 2d at 734-35. Subsection

---

[9]There was only one difference between the draft suspension agreement that was initialed by Commerce and the Government of Brazil, and the Suspension Agreement that they actually executed by the two parties – and that change was not made to reflect the comments of the petitioning Domestic Producers. *See* Bethlehem II, 25 CIT at 907, 159 F. Supp. 2d at 742-43.

[10]The following month, the I TC issued its final determination on material injury, confirming its affirmative preliminary finding.

(b) agreements eliminate or offset completely a countervailable subsidy, or cease exports of the subject merchandise. 19 U.S.C. § 1671c(b) (1994).[11] In contrast, subsection (c) agreements – like the Suspension Agreement at issue here – do not cease exports; nor do they completely eliminate or offset countervailable subsidies. Rather, they eliminate only the exports' injurious effect. 19 U.S.C. § 1671c(c).

Prior to accepting either a subsection (b) or (c) agreement, Commerce must find both that "suspension of the investigation is in the public interest," and that "effective monitoring of the agreement by the United States is practicable." 19 U.S.C. § 1671c(d)(1). Commerce also is required to notify petitioners of, and consult with them concerning, its intention to suspend the investigation. Further, Commerce must provide petitioners with a copy of the proposed agreement, and accord them an opportunity to comment. 19 U.S.C. § 1671c(e).

But there are additional requirements for subsection (c) agreements. Because such agreements, by definition, allow some subsidy practices to continue, Congress imposed further restrictions on subsection (c) agreements, limiting their use to cases involving "extraordinary circumstances" – cases where the suspension of the investigation is more beneficial to the domestic industry than its continuation, and where the investigation is "complex." *See* S. Rep. No. 96-249, at 51 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 437 (discussing the extraordinary circumstances requirement set out in 19 U.S.C. § 1671c(c)(4)).

Moreover, while all subsection (c) agreements require findings of "extraordinary circumstances" and "complexity" (as discussed above), there are even more, unique requirements

---

[11]All statutory citations are to the 1994 edition of the U.S. Code.

for those subsection (c) agreements which are – like the Agreement here at issue – quantitative restriction agreements.[12]  Specifically, the statute mandates that, in evaluating the public interest vis-à-vis such an agreement, Commerce must both (i) consult with potentially affected consuming industries, as well as potentially affected producers and workers in the domestic industry, and (ii) take into account the impact of such an agreement on U.S. consumers, the international economic interests of the United States, and the competitiveness of the domestic industry (in addition to any other necessary or appropriate factors).  19 U.S.C. § 1671c(d)(1).

As Congress intended, Commerce has invoked the suspension provisions of the trade laws only infrequently in both countervailing duty and antidumping investigations.  Notably, prior to the suspensions of both the countervailing duty investigation at issue and the parallel antidumping investigation, Commerce had accepted only four other subsection (c) agreements, including both antidumping and countervailing duty cases.  (Significantly, in each of those four prior cases, Commerce sought – and obtained – the consent of the petitioners.)  *See* Bethlehem II, 25 CIT at 899, 159  F. Supp. 2d at 735.

Moreover, not only were suspension agreements expected to be relatively unusual but, in addition, Congress also intended that – in those rare cases where they were appropriate – suspension agreements generally would be entered into very early in the investigative process.  *See generally* Bethlehem I, 25 CIT at 522, 146 F. Supp. 2d at 930-31; Bethlehem II, 25 CIT at 898, 159 F. Supp.

---

[12]A quantitative restriction agreement is an agreement by a foreign government to limit the volume of imports of the merchandise at issue into the United States – that is, an agreement establishing a quota.  *See* 19 U.S.C. § 1671c(c)(3).

2d at 733; <u>Bethlehem III</u>, 28 CIT at _____, 316 F. Supp. 2d at1313.[13]  Consistent with that intent, the Commerce Department's regulations require, in a nutshell, that a copy of any proposed countervailing duty suspension agreement be forwarded to petitioners no later than 15 days after Commerce's preliminary determination, and Commerce must accept or reject a final agreement no later than 45 to 60 days after the preliminary determination (depending on the circumstances).  *See* 19 C.F.R. §§ 351.208(f)(1)(ii), 351.208(f)(2)(i)(B), 351.208(g)(1).

### III.  Analysis

In patent contravention of Congressional intent and Commerce's own regulations, the timing of the Suspension Agreement in this action gave new meaning to the phrase "down to the wire."  As discussed in greater detail below, the timing issue has cast a long shadow over the Agreement.  Indeed, it has significant, and arguably fatal, implications for the Agreement, in light of several provisions of the applicable statute – particularly the notice-and-comment requirements and the consultation requirements, as well as the "more beneficial" requirement.

### A.  Notice, Comment and Consultation

The notice, comment and consultation requirements of the suspension agreement statute mandate that, before entering into such an agreement, the Commerce Department must:

> (1) notify the petitioner of, and consult with the petitioner concerning, its intention to suspend the investigation . . . not less than 30 days before the date on which it suspends the investigation,

---

[13]*But see* S. Rep. No. 96-249, at 15, *reprinted in* 1979 U.S.C.C.A.N. at 401 (contemplating that, in certain cases, Commerce could accept a suspension agreement as late as its final determination).

> (2) provide a copy of the proposed agreement to the petitioner . . . together with an explanation of how the agreement will be carried out and enforced (including any action required of foreign governments), and of how the agreement will meet the requirements of subsections (b) and (d) or (c) and (d) of [the statute], and
>
> (3) permit all interested parties . . . to submit comments and information for the record before the date on which notice of suspension of the investigation is published . . . .

19 U.S.C. § 1671c(e). The legislative history of the statute highlights the importance of those provisions, emphasizing that "the requirement that the petitioner be consulted will not be met by pro forma communications. Complete disclosure and discussion is required." S. Rep. No. 96-249, at 54, *reprinted in* 1979 U.S.C.C.A.N. at 437.

The Domestic Producers argue that "while Commerce has refused to make any effort to engage in meaningful consultations with Plaintiffs, it has continued to engage in discussions with the Brazilians." Indeed, the Domestic Producers emphasize that "Commerce has had almost five years and numerous opportunities to consult with Plaintiffs and to comply with the requirements of the suspension agreement statute, . . . [but] has shown time and time again that it is unwilling to do so." The Domestic Producers therefore urged, in their comments on the Redetermination on Remand, that "[t]he time for consultations and for Commerce to act should . . . be declared over." Plaintiffs' Brief at 12.

In contrast, as it has from the start, the Government maintains that the Commerce Department complied fully with all applicable notice, comment and consultation requirements. *See*, *e.g.*, Bethlehem II, 25 CIT at 904-05, 159 F. Supp. 2d at 739-40 (and authorities cited there); Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1315; Redetermination on Remand at 5, 7-11, 28, 31 ("Commerce has given petitioners a full opportunity to express their views and to make known their

objections to the Agreement"). However, it is not enough to prove that the agency solicited and received comments from the Domestic Producers before executing the Suspension Agreement. As the Government has previously conceded, the agency must also give those comments meaningful consideration. *See* Bethlehem II, 25 CIT at 907, 159 F. Supp. 2d at 743 (*citing* Oral Argument Tr. at 44-46). In addition, the agency must engage the Domestic Producers in good faith consultations, in a timely fashion.[14] Given the timeline on which the agency was operating, that was virtually impossible here.

Though it has no one but itself to blame, the Commerce Department found itself engaged in a headlong race against time – rushing to complete both the Suspension Agreement and the agency's Final Determination.[15] As a purely practical matter, the clock effectively refutes any suggestion that

_____

[14]In addition to the consultation requirements of 19 U.S.C. § 1671c(e) (quoted above), which govern all suspension agreements under both subsections (b) and (c), there are additional consultation requirements which apply to quantitative restriction agreements such as the Suspension Agreement at issue here. *See* 19 U.S.C. § 1671c(d)(1).

Throughout this action, the Government has persisted in conflating Commerce's notice-and-comment obligations with its consultation obligations. And, to some extent, the Government has also conflated its consultation obligations under one part of the statute with its consultation obligations under another part. However, the statute is clear: Commerce's consultation obligations are separate and distinct from (albeit related to) its notice-and-comment obligations. *See generally* Bethlehem II, 25 CIT at 908 n.26, 159 F. Supp. 2d at 743 n.26; Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1317. And, as discussed immediately above, the statute imposes several separate and distinct consultation obligations as well.

[15]As Bethlehem II noted, there can be no doubt that "the tandem tasks of both finalizing the [agency's] Final Determination and determining whether to suspend the investigation in fact did tax Commerce personnel to the limit." Bethlehem II, 25 CIT at 906 n.24, 159 F. Supp. 2d at 742 n.24.

Indeed, Commerce promulgated the agency regulations here at issue to significantly advance the deadlines for initialing and signing suspension agreements to avoid precisely the dilemma presented here – the "enormous burden on the parties and on the Department" inherent in the simultaneous consideration of a suspension agreement and preparation of a final determination. *Id*.

the agency gave the Domestic Producers' comments the meaningful consideration required by the statute – a point reinforced by the administrative record, which initially was essentially devoid of affirmative evidence "to indicate that Commerce even reviewed – much less considered or responded to – the petitioners' written comments" before concluding the suspension agreement. *See* Bethlehem II, 25 CIT at 905, 159 F. Supp. 2d at 740.

Nor does the Commerce Department claim that it made one single change to the proposed agreement to reflect the concerns expressed in the Domestic Producers' comments. Indeed, it is undisputed that the agency failed even to correct any of the numerous typographical errors and erroneous cross-references in the proposed agreement, which the Domestic Producers pointed out in their comments. *See* Bethlehem II, 25 CIT at 907 n.25, 159 F. Supp. 2d at 743 n.25; Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1311. That fact is silent (and damning) testimony to the press of time under which the agency was operating, and – particularly in the totality of the circumstances – calls into question how carefully and by whom (perhaps even whether) the Domestic Producers' comments were read before the Suspension Agreement was executed. At a bare minimum, the agency's skin-of-its teeth timing belies any argument that the Domestic Producers' comments were carefully analyzed or given serious consideration – much less that the Agreement was the subject of meaningful, good faith consultations – before the Commerce Department executed the Agreement.[16]

_____

(*quoting* Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,316 (Dep't Commerce Feb. 27, 1996) ).

[16]Bethlehem III disposed of the Domestic Producers' more technical challenges to the Commerce Department's analysis of their comments on remand. *See* Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1316-17 (addressing, *inter alia*, Domestic Producers' arguments that Commerce failed to respond to a number of their comments, and "flatly rejected every single one").

Bethlehem III accorded the Commerce Department "one final opportunity to engage in further consultations with the Domestic Producers," and emphasized that – if it were, in fact, even possible for the agency to remedy *post hoc* its violation of the Domestic Producers' right to *pre-agreement* consultations (a question on which judgment was reserved) – Commerce would be required to "give meaningful consideration to *terminating, abandoning or revising* the Agreement, in light of the Domestic Producers' comments and the agency's consultations; and that consideration must be sufficiently documented in the administrative record to enable a court to review the agency's action and satisfy itself that the agency's consideration of options was, indeed, meaningful." Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1319 (emphasis added).

Instead, the agency's Redetermination on Remand includes little more than a chronology of contacts with the Domestic Producers. *See* Redetermination on Remand at 6-11, 31-33. The record on remand is barren of evidence that the agency complied with the court's instructions to "give meaningful consideration to terminating, abandoning or revising the Agreement" – with the exception of Commerce's bald assertions that it "has meaningfully consulted with petitioners and considered the possibility of termination," but "has concluded not to terminate the Agreement" since the Agreement "[has] not been violated and meets the requirements" of the statute. *See* Redetermination on Remand at 31, 33. As a procedural matter, self-serving, conclusory statements

---

However, Bethlehem III did not reach the fundamental question whether a *post hoc* analysis of a petitioner's comments effectively remedies the agency's violation of the statute's procedural requirement that comments be considered *before* an agreement is executed. *See generally* Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1319 (observing that, while "it is clear that the Domestic Producers have been deprived of certain procedural rights accorded them by the statute," it is "entirely unclear . . . whether those deprivations can be effectively remedied").

such as those cannot constitute a record sufficient to enable a court to "satisfy itself that the agency exercised a reasoned discretion" in reaching its determination. *See* Greater Boston Television Corp. v. Federal Communications Comm., 444 F.2d 841, 850 (D.C. Cir. 1971).

Moreover, as Bethlehem III suggested, Commerce's approach to notice-and-comment and consultation is not only procedurally defective; it is substantively flawed as well. *See* Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1318-19. Ordered to consider whether the Agreement should be modified or rescinded in an effort to cure (if possible) the agency's failure to comply with the procedural requirements of the statute before the Agreement was executed, Commerce responded that it "has concluded not to terminate the Agreement" because it "[has] not been violated and meets the requirements" of the statute. *See* Redetermination on Remand at 31, 33. That is not the proper standard.

In short, Commerce has continued to view the Agreement through the rear-view mirror – treating it as a "done deal." Commerce's perspective may be understandable, under the circumstances. But, as Bethlehem III observed, any dilemma that the agency has confronted is one of its own making:

> Due to its own failure to allow itself sufficient time to consult meaningfully with the Domestic Producers before entering into the Suspension Agreement, Commerce may well now feel trapped between a rock and a hard place. Although it has sought (however belatedly) to consult with the Domestic Producers, it (at least arguably) cannot repudiate the Agreement, or even revise it without the consent of the Brazilian Government. Under these circumstances, it is perhaps not surprising that Commerce's general tenor throughout these proceedings has been to minimize or dismiss the Domestic Producers' comments and concerns.

Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1318.

Given the procedural posture of this case, it is now (mercifully) unnecessary to decide whether there is any action that the agency could take at this time that would effectively remedy *post hoc* its violation of the Domestic Producers' statutory right to *pre-agreement* consultations. But, clearly, that violation could not be cured by applying the standard that Commerce articulated here. As <u>Bethlehem III</u> observed:

> [D]ue to the unique posture of this case, Commerce now necessarily views the Domestic Producers' comments through the prism of an *executed* Agreement by which it is bound, and rejects their concerns because (according to Commerce) they do not reflect either a violation of the statute, or a violation of the Agreement (which would justify its termination). . . . There can be little doubt that this is a very different – and much more rigorous – standard for comments than that which Commerce has applied in other cases, where it has consulted petitioners in advance.

<u>Bethlehem III</u>, 28 CIT at ____, 316 F. Supp. 2d at 1319.

The two-part standard that Commerce applied in this case – *i.e.*, that the terms of the suspension agreement (a) meet the requirements of the statute, and (b) have not been violated – may be a standard that properly could be applied to justify an agency decision not to terminate an agreement that was entered into in full compliance with the procedural requirements of the statute. But the Agreement in this case is not such an agreement.

The standard articulated by Commerce is far too lenient where, as here, the agency failed to accord the Domestic Producers their procedural rights *before* signing the agreement. In such a case, Commerce can cure its error – if at all – only by seeking to "turn back the clock" and to now consider how it would have modified the draft Agreement (and, indeed, whether it would have entered into the Agreement at all) if – in the fullness of time, *before* signing the Agreement – it had

engaged in meaningful, good faith consultations with the Domestic Producers and had given careful

consideration to their comments, as the statute requires.

As Bethlehem III noted:

> One can only speculate what the Suspension Agreement would have looked like had Commerce allowed itself sufficient time to confer in advance with the Domestic Producers in order to ascertain their concerns, and then to negotiate with the Brazilian Government in an effort to resolve them. Maybe timely consultations and negotiations would have yielded a suspension agreement acceptable to the Domestic Producers (as such consultations and negotiations have in all other cases); maybe there would have been no agreement at all. In any event, it is highly unlikely that – had Commerce consulted with the Domestic Producers in a timely fashion (as the statute requires) – any resulting agreement would have been identical in every respect to the Agreement now in place.

Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1318-19 (footnote omitted).


### B.  Extraordinary Circumstances/"Beneficiality"

Just as the timing of the Agreement here prejudiced Commerce's ability to comply with the

*procedural* requirements of the suspension agreement statute, it had equally grave implications for

certain of the statute's *substantive* requirements. The so-called "beneficiality" requirement is a case

in point.

As summarized in section II above, subsection (c) agreements (like the Suspension

Agreement here) are limited to cases involving "extraordinary circumstances" – that is,

circumstances in which, *inter alia*, "suspension of an investigation will be *more beneficial to the*

*domestic industry* than continuation of the investigation." 19 U.S.C. §§ 1671c(c)(1), 1671c(c)(4)(A)

(emphasis added).

As section II explains, Congress intended suspension agreements would be used only rarely and, in any event, *early in an investigation* – when the intrinsic benefits inherent in an agreement would include the avoidance of substantial costs at the administrative and appellate levels by all parties, as well as the availability of early and certain (even if different, or arguably less complete) relief for the domestic industry.[17]  Commerce's own regulations are to the same effect.

In this respect, suspension agreements have been aptly analogized to settlement agreements used in general civil litigation.  *See*, *e.g.*, Bethlehem II, 25 CIT at 896, 159 F. Supp. 2d at 731-32 (*citing*, *inter alia*, 125 Cong. Rec. 20,168 (1979), noting that members of Congress analogized suspension agreements to settlement agreements in general civil litigation).  Early in a civil case, both parties have incentives to settle, and both parties face uncertainty.  As a general matter, as litigation progresses, the parties' "sunk costs" mount (and thus the price tag on settlement increases),

_____

[17]"In authorizing the use of suspension agreements in appropriate countervailing duty cases, Congress recognized their 'importance . . . to both importers and domestic industry as *a means of achieving the remedial purposes of the law in as short a time as possible and with a minimum expenditure of resources by all parties involved.*'" Bethlehem II, 25 CIT at 898, 159 F. Supp. 2d at 733 (*quoting* H. Rep. No. 96-317, at 53 (1979)) (emphasis supplied).

*See* S. Rep. No. 96-249, at 54, 1979 U.S.C.C.A.N. at 440 (touting suspension agreements as a means of "permit[ting] *rapid* and pragmatic resolutions of countervailing duty cases") (*quoted in* Bethlehem II, 25 CIT at 898, 159 F. Supp. 2d at 733) (emphasis added).  *See also* H. Rep. No. 96-317, at 55, 65 (including, among the advantages of subsection (c) suspension agreements, "the *expenses saved* because of *prompt settlement* of a case" and "the *certainty* of *prompt relief*") (*quoted in* Bethlehem II, 25 CIT at 898 n.10, 159 F. Supp. 2d at 733 n.10) (emphasis added); Statements of Administrative Action for Trade Agreements Act of 1979, H.R. Doc. No. 96-153, Part II at 402, *reprinted in* 1979 U.S.C.C.A.N. 665, 675 (emphasizing that the advantages of subsection (c) agreements include "the value of *settling the case quickly*" and "the *certainty* of *prompt relief*") (*quoted in* Bethlehem II, 25 CIT at 898 n.10, 159 F. Supp. 2d at 733 n.10) (emphasis added).

and the parties' uncertainty as to the outcome of the case diminishes (as they get a better "feel" both for the probability that they will prevail at trial, and for the range of money damages that could be awarded).

Thus, early in a case, an injured party has an incentive to settle because, *inter alia*, (a) it has relatively little "feel" for how much it may be awarded at trial (and, indeed, there is at least a possibility that it will be awarded nothing at all); and (b) it can avoid most, if not all, of the costs of litigation. An early settlement – ensuring an injured party at least some measure of relief – may thus be attractive (even though the relief is less than the party might have received at trial), because (a) the relief is immediate; (b) the relief is certain (*i.e.*, the injured party avoids the risk that it will be found entitled to no relief at all, or to less relief than that for which it settled); and (c) the relief is not diminished by the expense of litigation. Civil litigants – by definition – "settle" their cases (if at all) *before* the jury returns its verdict (and, often, well before the case even goes to trial). But that is not what happened here.

Here, it is as though the jury returned its verdict (*i.e.*, the Commerce Department completed its investigation and rendered its Final Determination), but the plaintiffs inexplicably then decided to settle for *less* than the amount of the jury's verdict – except that, of course, here the "plaintiffs" (*i.e.*, the Domestic Producers) were not even a party to the "settlement."[18]

---

[18]*See* 125 Cong. Rec. 20,168 (1979) (in a colloquy immediately preceding vote on proposed suspension agreement statute, Senator Heinz distinguished suspension agreements from the settlement agreements used in general civil litigation, emphasizing that the domestic industry is not a party to a suspension agreement: "In fact there is a major difference [between suspension agreements and settlement agreements in general civil suits]. In a suit any settlement is between plaintiff and defendant. In this bill any settlement is between defendant and judge, a very different relationship, especially when the judge is not always neutral.").

Given the timing in this case, the Domestic Producers – as a practical matter – had little or nothing to gain by the Suspension Agreement. Because the Suspension Agreement was executed on the deadline for the issuance of Commerce's Final Determination, there was no "uncertainty of relief." As a practical matter, the Domestic Producers knew *precisely* what relief they would have received under a countervailing duty order, and the "benefits" accorded to them under the Suspension Agreement paled by comparison. Moreover, because the Suspension Agreement was executed on the deadline for the issuance of Commerce's Final Determination, the "benefits" accorded the Domestic Producer under the Suspension Agreement were not – in any real sense – more immediate than the relief that they would have received under an order. Further, because the Commerce Department entered into the Suspension Agreement at the very end of the investigation, the Domestic Producers were not spared the costs of investigation and litigation. (Indeed, *over and above* the full costs of completing the countervailing duty investigation, they were also forced to incur the costs of analyzing and commenting on the draft Suspension Agreement – on an exigent basis, no less.) *See generally* Bethlehem II, 25 CIT at 916 n.42, 159 F. Supp. 2d at 751 n.42 (addressing parties' respective arguments on lack of benefits of "early settlement" in this case).

In short, by choosing to enter into the Suspension Agreement here *at the last possible moment* permitted by the statute, the Commerce Department not only flouted its own regulations governing the timing of such agreements (and violated the procedural requirements of the statute), it also

deprived itself of the ability to point to the availability of early relief and savings to all parties as benefits of the Agreement.[19] *See generally* Plaintiffs' Brief at 33-34.

In an attempt to build a case that the Agreement is "more beneficial" to the Domestic Producers than would be a countervailing duty order, but unable to rely on any of the benefits inherent in a suspension agreement reached early in an investigation, Commerce has been reduced to pointing to a laundry list of asserted "benefits," which the Domestic Producers emphatically reject. *Compare* Redetermination on Remand at 13-16, 34-43 *with* Plaintiffs' Brief at 23-34 *and* Plaintiffs' Reply Brief at 9-14.

In light of the procedural posture of the case, there is no need to here analyze separately each of the asserted "benefits" that Commerce has identified. Suffice it to say that at least some of the agency's claims of "benefit" are strained. For example, in its Redetermination on Remand, Commerce continues to tout the Agreement's three-month "moratorium" on imports,[20] emphasizing that such relief would be beyond the scope of a countervailing duty order, and arguing that the

---

[19]It also seems likely that – if Commerce had engaged in the meaningful, good faith consultations with the Domestic Producers required by the statute *before* concluding the Agreement – the Agreement (if there was one) would have looked at least somewhat different, and might have incorporated other, additional "benefits" to the Domestic Producers to which Commerce could now point. *See generally* 25 CIT at 906 n.24, 159 F. Supp. 2d at 742 n.24 (noting that, in the course of oral argument, counsel for the Government conceded that the press of time constrained Commerce's ability to consult with the petitioning Domestic Producers before executing the Agreement).

As Bethlehem II noted, nothing in the parties' submissions discloses why Commerce failed in this case to adhere to the timeline established in its own regulations. Bethlehem II, 25 CIT at 906 n.24, 159 F. Supp. 2d at 742 n.24.

[20]Specifically, under the Agreement, imports of Brazilian steel were excluded from the United States from July 19, 1999 through September 30, 1999. *See* Suspension Agreement, 64 Fed. Reg. at 38,798.

Agreement is thus "more beneficial" than an order. *See, e.g.*, Redetermination on Remand at 13-14, 21-24, 40-41. But the mere fact that a suspension agreement affords an industry some particular form of relief that would not be available under an order cannot, as a matter of logic, mean that the agreement is necessarily "more beneficial" to the domestic industry. That particular form of "relief" may be of little interest or benefit to the industry at issue, particularly compared to the relief available under a countervailing duty order. Apples-to-oranges comparisons are dangerous. When you're making orange juice, apples hold little appeal.

Moreover, the extent of any purported alternative "relief" must be considered as well. Commerce here relies on a three-month moratorium. But there is no apparent magic to three months (as opposed to a shorter, or longer, period). What about one day? A one-day moratorium is "relief" that is not available under a countervailing duty order. Would Commerce try to argue with a straight face that a *one-day* moratorium would suffice to make a suspension agreement "more beneficial" than an order?

Commerce's inability to point here to benefits of "early settlement" – early and certain relief for the domestic industry, and cost savings for all parties – as "benefits" to the Domestic Producers seriously undermines the agency's ability to establish the "extraordinary circumstances" required under the statute, and has left the agency grasping at straws. The infirmities in its case on "beneficiality" are both illustrated and exacerbated by the Domestic Producers' opposition to (and the wholesale absence of any affirmative support for) the Suspension Agreement.

Emphasizing that they speak for a majority of the domestic industry,[21] the Domestic

Producers have argued in this action that Commerce cannot find the Agreement to be "more

beneficial" to the domestic industry if the Domestic Producers themselves oppose it. *See* Bethlehem

II, 25 CIT at 912-13, 159 F. Supp. 2d at 747-48 (and authorities cited there); Bethlehem III, 28 CIT

at ____, 316 F. Supp. 2d at 1320 (and authorities cited there). Although Bethlehem III rejected the

suggestion that – as a matter of law – the statute's "beneficiality" requirement requires the

petitioning industry's consent for a subsection (c) agreement, it sounded a note of caution:

> To say that the statute does not require petitioners' consent to a subsection (c) agreement, however, is not to say that their opposition is irrelevant. Even if petitioners' consent is not *per se* required, the extent of the domestic industry's consent – or opposition – logically must bear on (and, arguably, itself constitutes evidence as to) whether or not a suspension agreement is, in the words of the statute, "more beneficial to the domestic industry." *When Commerce elects to enter into a subsection (c) agreement over the objections of a majority of the industry, it does so at its peril – particularly where, as here, it cannot point to "early settlement" as a benefit.*

---

[21]In its Redetermination on Remand, Commerce repeatedly seeks to minimize the significance of the Domestic Producers' opposition, asserting that "[t]he stated opinions of the petitioners, however, cannot be considered representative of the opinions of all petitioners, let alone of the domestic industry as a whole." Redetermination on Remand at 40. *See also id*. at 13 ("These stated opinions of the five petitioners, however, cannot be considered representative of all the parties to this proceeding, nor reflective of the entire hot-rolled flat-rolled carbon-quality steel industry.").

Contrary to Commerce's implication, the uncontroverted evidence of record establishes that the plaintiff Domestic Producers constitute roughly half of the industry overall, and well over half of the industry that participated in the underlying investigation. *See* footnote 1, *supra*.

Moreover, it is noteworthy that, "[i]n the companion case challenging the suspension agreement in the related antidumping proceeding, the Government and the Brazilian Exporters made much of the fact that seven of the petitioning U.S. steel producers wrote a letter supporting certain aspects of that agreement. *In contrast, none of the petitioners here broke ranks*." Bethlehem II, 25 CIT at 913 n.33, 159 F. Supp. 2d at 748 n.33 (citation omitted) (emphasis added).

Bethlehem III, 28 CIT at ____, 316 F. Supp. 2d at 1321-22 (emphasis added). As Bethlehem III concluded, "Commerce is being far too cavalier here. It cannot dismiss the fact that a majority of the industry affirmatively and vehemently opposes the Suspension Agreement, and no one – not a single domestic producer . . . – affirmatively supports it."[22] 28 CIT at ____, 316 F. Supp. 2d at 1322.

It is indeed telling that – as section II above notes – Commerce had obtained the domestic industry's consent to all subsection (c) suspension agreements, prior to this one.[23] In the final analysis, although the suspension agreement statute grants Commerce the authority to make the "more beneficial" determination, any such determination must be supported by substantial evidence on the record and otherwise in accordance with law. It is not at all clear that Commerce could ever justify making a "more beneficial" finding in the face of so much industry opposition – particularly where, as here, there is no affirmative industry support, and there are no "benefits" associated with the timing of the agreement.

---

[22]Commerce's inability to establish, and document for the record, at least *some* affirmative support from domestic producers may be simply yet another symptom of the extreme time pressure under which the agency was operating.

[23]Of course, as Bethlehem III pointed out, none of Commerce's prior subsection (c) agreements involved the exigencies present in this case (and in the companion antidumping case). "[T]hus, [in those other cases], there was presumably the opportunity for greater consultation and negotiation between Commerce and the domestic interests on the one hand, and between Commerce and the foreign interests on the other hand." Bethlehem III, 28 CIT at ____ n.13, 316 F. Supp. 2d at 1318 n.13. Obviously, adequate time for meaningful, good faith consultation enhances the likelihood of negotiating an agreement that both enjoys the support of the domestic industry and is acceptable to the foreign interests at issue.

## IV. **Conclusion**

This case tests the absolute outer limits of Commerce's authority to enter into suspension agreements. If Commerce can enter into a subsection (c) suspension agreement under circumstances such as those presented here – at the eleventh hour, where there are no benefits of "early settlement," and over the vehement objections of the majority of the domestic industry, with no affirmative domestic industry support whatsoever – the agency's authority may be, as a practical matter, virtually unconstrained.

Here, more than five years after the commencement of this action, Commerce still had yet to "directly address the extent of the opposition of the domestic industry" to this Agreement. Nor did the agency ever "articulate precisely why its judgment as to the best interests of the industry should be credited over that of [the majority of those in the industry]" – that is, the judgment of the men and women in the trade "who live and breathe the industry every day, and whose futures and fortunes are inextricably tied to it." Bethlehem III, 28 CIT ____, 316 F. Supp. 2d at 1322.

The administrative record is also conspicuously silent on the reason behind the extraordinary, last-minute timing of the Agreement – the need for exigency. However, as supplemented on remand, the record does offer some insight into the Agreement's *raison d'etre*:

> In mid-1997, a severe financial crisis spread through many economies in Asia and led to the region's worst economic downturn in thirty years. Within a year, the financial contagion had also spread to Russia and Brazil. In 1998, the Brazilian currency began to depreciate sharply. The value of the *real* with respect to the U.S. dollar fell 8 percent during that year, then plunged another 30 percent in the one-half year before the signing of the Agreement. The country's financial crisis threatened to spill over to other economies in the region. The financial crisis that began in Asia and spread to Brazil was an unprecedented event that took place just prior to the time during which the Agreement was being considered. *In part as a result of the worsening economic circumstances in Brazil, and the concern that the country's*

> *financial crisis could spread to other economies, Commerce sought to foster and support economic stability in Brazil.*
>
> Brazil has a significant steelmaking capacity that is an important sector of the Brazilian economy. By permitting Brazilian hot-rolled steel manufacturers to continue to sell hot-rolled steel in the United States, albeit within the significant disciplines of a suspension agreement, *the Agreement fosters economic stability in an important sector of the overall Brazilian economy.*

Redetermination on Remand at 26 (emphasis added). *See also id*. at 29 (emphasizing that "Brazil is a major U.S. trading partner, the largest Latin American economy, and an economy that is facing economic instability").[24]

The suspension agreement statute provides that, in evaluating a proposed subsection (c) agreement involving quantitative restrictions, the Commerce Department must consider whether the proposed agreement is in the public interest. The three factors to be weighed in determining the public interest include – in addition to, *inter alia*, "the relative impact on the competitiveness of the domestic industry . . . , including any such impact on employment and investment in that industry" – "the relative impact on the international economic interests of the United States." 19 U.S.C. § 1671c(a)(2)(B).

---

[24]That language is taken verbatim from Commerce's prior remand results. *See* Amended Final Redetermination Pursuant to Court Remand (March 7, 2002) at 14-15, 36.

Significantly, the Public Interest Memorandum that Commerce prepared in July 1999 to support its initial suspension determination alluded only vaguely to the benefits that the Brazilian Exporters were expected to reap from the Agreement. *See* Memorandum from ITA Office of Policy to Ass't Sec. For Import Administration (July 6, 1999) (Supp. P.R. Doc. No. 2) ("Public Interest Memorandum"). Only more recently has Commerce expressly acknowledged those benefits, albeit casting them as integrally tied to "the international economic interests of the United States."

Commerce was thus required by statute to consider the "international economic interests" of this country in evaluating the proposed agreement at issue here. But nothing in the statute suggests that Congress intended "international economic interests" to trump other statutory criteria. Nothing in the statute suggests that Congress intended to permit "beneficiality" to the domestic industry to be sacrificed on the altar of foreign policy or politics. Indeed, to the contrary, as section II above explains, Congress enacted the suspension agreement statute for the express purpose of imposing on the Executive Branch "strict limits on discontinuing or suspending investigations pursuant to deals with foreign governments." *See generally* Bethlehem II, 25 CIT at 896-98, 159 F. Supp. 2d at 733-34 (*quoting* 125 Cong. Rec. 20,163 (1979)).

As Bethlehem III observed, this case ultimately leaves one "with a distinctly uneasy sense that there is more here than meets the eye – that not all the cards are on the table." Bethlehem III, 28 CIT ____, 316 F. Supp. 2d at 1322. Fortunately for Commerce, the procedural posture of the case spares it from any deeper probing of the bases for its actions in this case. Perhaps time will prove this case to be anomalous, an aberration of agency practice.[25]

It is worth noting that, in the future, the Commerce Department would be well advised to honor the letter and the spirit of both the suspension agreement statute and its own regulations, including those provisions governing the timing of such agreements. Any failure to do so may cast

---

[25]There is, however, at least one case pending before the court in which the plaintiffs allege that Commerce's failure to comply with the deadlines set in its own regulations governing suspension agreements constitutes reversible error. *See* Complaint at ¶¶ 16-23 *and* Memorandum of Points and Authorities in Support of San Vicente Camalu's Motion for Judgment on the Agency Record at 11-20, San Vicente Camalu SPR de RI v. United States, No. 02-00811 (CIT filed Dec. 17, 2002).

grave doubt on the legitimacy of the agency's exercise of its authority, and raise the spectre of its abuse for improper purposes, risking not only judicial review but Congressional scrutiny as well.

An Order of Dismissal will enter accordingly.


_____s/_____
Delissa A. Ridgway
Judge

Decided:   January 21, 2005
           New York, New York

ERRATA


United States Steel Corporation and Ispat Inland Inc. v. United States and Usinas Siderurgicas de Minas Gerais S/A, Companhia Siderurgica Paulista and Companhia Siderurgica Nacional, Court No. 99-08-00525, Slip Op. 05-4, dated January 21, 2005.


Page 5:  In line 6 of paragraph 2 of footnote 7, replace "of the Brazil's" with "of Brazil's".

Page 7:  In line 3 of footnote 9, delete "by the two parties".

Page 23:  In line 3 of footnote 21, replace "petitioners, however, cannot" with "petitioners . . . cannot".


February 9, 2005